**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**TINA RAY**                                                      **PLAINTIFF**

**v.**                                         **CIVIL ACTION NO. 1:17-CV-71-RP**

**THE DUFRESNE SPENCER GROUP, LLC**
**d/b/a ASHLEY FURNITURE HOME STORE;**
**and JEFF ROGERS**                                              **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

Defendants The Dufresne Spencer Group, LLC d/b/a Ashley Furniture Home Store ("DSG") and Jeff Rogers ("Rogers") (collectively, "Defendants") have moved for summary judgment under Federal Rule of Civil Procedure 56 on Plaintiff's Title VII claims and state law claims of assault and battery and intentional infliction of emotional distress. Doc. 56. Plaintiff Tina Ray ("Plaintiff") has responded in opposition to the motion, and the Court, having considered the submissions of the parties, finds that the motion should be denied except as to Plaintiff's claims for assault and battery. Defendants' motion for summary judgment as to Plaintiff's state law assault and battery claims is granted.

This is a sexual harassment case arising out of a hostile work environment allegedly suffered by Plaintiff while employed by DSG. Plaintiff contends that Rogers, her immediate supervisor, subjected her to repeated sexual harassment which allegedly included propositions for sex, sexual innuendo and sexually explicit remarks, and unwanted and offensive physical contact. Plaintiff claims that her accounts and commissions were given to another female employee who admitted having an affair with Rogers, the store manager. Plaintiff alleges that she was discharged on pretext for her failure to comply with Rogers' sexual advances and

demands. Plaintiff also brings related state law claims for assault and battery and intentional infliction of emotional distress.

Defendants argue there is no genuine issue as to any material fact regarding their liability for any sexual harassment under Title VII or regarding Plaintiff's state law claims of assault and battery and intentional infliction of emotional distress. Further, as to Plaintiff's hostile work environment claim, DSG claims it is entitled to immunity under the *Ellerth/Faragher* defense.

## I.     Standard of Review

Federal Rule of Civil Procedure 56 governs summary judgment. Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.* at 323. If the moving party satisfies this burden, the nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324 (citation omitted).

In reviewing the evidence, factual controversies are to be resolved in favor of the non-movant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When such contradictory facts exist, the

Court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## II.     Title VII Claims for Sexual Harassment

Title VII of the Civil Rights Act of 1964 mandates that

> [i]t shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1) (2006). Sexual harassment is a prohibited form of employment discrimination under Title VII. *Jones v. Flagship Int'l*, 793 F.2d 714, 719 (5th Cir. 1986).

When the Title VII sexual harassment claim is against a supervisor, a plaintiff must satisfy the following four factors in order to establish a *prima facie* case:

(1) the employee belongs to a protected class;

(2) the employee was subject to unwelcome sexual harassment;

(3) the harassment was based on sex; and

(4) the harassment affected a term, condition or privilege of employment.

*Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 479 (5th Cir. 2008).

In the instant case, the Court finds that Plaintiff has sufficiently demonstrated that she was a member of a protected class and, because of her sex, was exposed to unwanted sexual harassment, to be discussed further herein. The first three elements of Plaintiff's sexual harassment claim are therefore satisfied.

Regarding the fourth prong, a plaintiff can show that a term, condition, or privilege of her employment was affected in one of two ways: *quid pro quo* harassment or hostile work environment. Pursuant to the "roadmap" for analyzing Title VII supervisor sexual harassment cases described by the United States Court of Appeals for the Fifth Circuit in *Casiano v. AT&T*

*Corporation,* whether an employee suffered a tangible employment action determines whether the claim is a *quid pro quo* harassment claim or a sexually hostile work environment claim. 213 F.3d 278, 283 (5th Cir.2000). If an employee has been subjected to a tangible employment action her claim is of the *quid pro quo* variety; otherwise, the claim is classified as one for hostile work environment. *Casiano,* 213 F.3d at 283.

Plaintiff alleges both *quid pro quo* sexual harassment and hostile work environment under Title VII. Plaintiff claims that she suffered an adverse employment action by allegedly being discharged on pretext when she failed to acquiesce to Rogers' sexual remarks, advances, and demands and further claims that DSG is liable for sexual harassment through its creation, toleration, and ratification of a hostile work environment.

### a.  Sexual Harassment by *Quid Pro Quo* under Title VII

To establish *quid pro quo* harassment in violation of Title VII, Plaintiff must show that (1) she suffered a tangible employment action and (2) the tangible employment action resulted from her acceptance or rejection of her supervisor's alleged sexual advances. *Casiano*, 213 F.3d at 283. A "tangible employment action" is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). It is the "means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Id.* at 762. "A tangible employment action in most cases inflicts direct economic harm." *Id*. at 761.

In other words, in order to survive summary judgment on her *quid pro quo* claim, Plaintiff must demonstrate a genuine issue of material fact regarding whether Rogers, her alleged harasser, took a tangible employment action against her because she rejected Rogers' sexual

advances. If Plaintiff proves that the tangible employment action resulted from her rejection of Rogers' sexual advances, then DSG is vicariously liable and the *Ellerth/Faragher* defense – the only affirmative defense in supervisor sexual harassment cases – is not available. *Casiano,* 213 F.3d at 284.

Plaintiff alleges that she suffered two tangible employment actions – when she was fired and when sales and commissions were taken from her – because of her refusal to accede to the sexual demands of her supervisor, Jeff Rogers.

### i. Termination

Defendants contend that Plaintiff was "terminated from DSG after she punched another employee in the chest on June 29, 2016" and claim that she "cannot show that any actions were taken against her resulting from her acceptance or rejection of Mr. Rogers' alleged sexual harassment." Doc. 58 at 1, 12. Defendants detail a confrontation between Plaintiff and another female employee, Dana Tubb ("Tubb"), during which Plaintiff punched Tubb in the chest, leaving DSG with "no choice but termination." *Id.* at 14. Defendants claim that there is "no genuine dispute as to the fact that [Plaintiff] was terminated as a direct result of her assault of another employee." *Id.*

Alternatively, Defendants claim that Plaintiff "had a history at [DSG] of causing problems, and her termination was probably past due." Doc. 58 at 13. Defendants describe a confrontation between Plaintiff and another employee during which Plaintiff said "F*** you" and cite to various employees' statements to DSG's Human Resources (HR) manager to demonstrate that

> [Plaintiff] was late more often than not, that she engaged in unethical behavior, that she was a compulsive liar who no one could trust, that she was manipulative, vindictive, dramatic, oversensitive, disruptive, frequently cried, did not follow floor etiquette, and that she regularly had issues with other employees, who would

complain about her […] [she] had a habit of being late when she arrived to work and when she returned from lunch, in violation of DSG's policy about arriving on time […] [she] did not always follow Ashely's procedures regarding approaching guests and was known for stealing guests […] [her] behavior caused disruption and animosity on the sales floor.

*Id*. at 13-14 (record citations omitted).

At his deposition, Rogers testified that Plaintiff came to work late, took extended lunches, and did not always follow DSG's guidelines. Doc. 59-3. Rogers claims that he verbally disciplined Plaintiff but never wrote her up for said behaviors. *Id*. Rogers testified that other employees came to work late, took extended lunches, and had similar problems with co-workers. *Id*.

Defendants concede that Plaintiff was terminated and that her termination is a tangible employment action. However, Defendants argue that Plaintiff cannot establish a causal connection between her rejection of Rogers' advancements and DSG's decision to fire her.

For summary judgment purposes, the Court must determine whether a genuine issue of material fact exists as to whether the Plaintiff's termination resulted from her rejection of Rogers' alleged sexual advances. *See Casiano*, 213 F.3d at 283. Plaintiff contends that the non-discriminatory reason Defendants offer for her termination is actually a pretext for her firing. Plaintiff claims that the real reason she was discharged was "because [she] failed to acquiesce to sexual remarks, advances, and demands of Defendant, Jeff Rogers." Doc. 1 at ¶ 22.

Under Title VII, a plaintiff can establish that the nondiscriminatory reason offered for the adverse employment action is pretextual either (1) through evidence of disparate treatment or (2) by showing that the proffered explanation is false or unworthy of credence. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an

inference of discrimination even without further evidence of defendant's true motive. No further evidence of discriminatory animus is required because "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation...."

*Laxton,* 333 F.3d at 578 (*quoting Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000)).

A showing of pretext is insufficient to establish discrimination "(1) when the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or (2) when the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue, and there was abundant and uncontroverted evidence that no discrimination occurred." *Laxton,* 333 F.3d at 578. "In a case in which the employer has articulated a rational justification for terminating an employee, and the facts supporting that justification are not seriously disputed, the task of proving pretext becomes quite difficult." *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999) (*citing Elliott v. Group Med. & Surgical Serv.,* 714 F.2d 556, 567 (5th Cir.1983)). Therefore, in order to survive Defendants' motion for summary judgment, Plaintiff must "produce evidence permitting the jury to disbelieve that [Defendants'] proffered reason was its true motivation." *Laxton*, 333 F.3d at 579.

Plaintiff has presented evidence of disparate treatment. With respect to Plaintiff's coworker Dana Tubb, who told Plaintiff that she and another employee had a threesome with Jeff Rogers and that Plaintiff would be expected to do the same, and whom Plaintiff believed Rogers favored over Plaintiff because Plaintiff did not agree to have sex with Rogers, Plaintiff's affidavit states:

Our salaries at DSG were primarily commission based. Jeff routinely gave Dana more business. Dana was allowed by Jeff to leave without clocking out. Jeff allowed Dana to do her school work at the store on store time. Dana was not penalized for doing personal work on company time. No one else could use company time to do personal work such as pursuing a degree. Immediately before

I was terminated, Dana was given a large account that all the employees knew was mine. I had already logged the customers information and quote into the computer the day before. The customer even asked for me when she returned to the store with her husband. The sale amounted to about $7000. The sale was awarded to Dana Tubb. I would get into trouble with Jeff for things but when Dana did the same things she did not get into trouble. … Other employees got into fights with Dana but Jeff always sided with Dana. Once Dana and Tomeaka White got into a spat over a ticket. Dana got in Tomeaka's face and Dana called Tomeaka a bitch. Jeff sent Dana home but allowed Dana to return a couple of hours later after Dana had cooled off. Dana received no apparent reprimand for her fight with Tomeaka.

Doc. 71-2. Viewed in the light most favorable to Plaintiff, this evidence of disparate treatment creates a fact issue regarding whether the stated reason for Plaintiff's termination was pretextual.

As to the second means of establishing pretext – showing that the proffered explanation is false or unworthy of credence – Plaintiff disputes Defendant's version of the event allegedly giving rise to her termination. Aside from Plaintiff's explanation of events leading up to the actual confrontation with Dana Tubb, and whereas Defendants assert Plaintiff was terminated because she punched or shoved Tubb, Plaintiff denies pushing, punching or popping Tubb. Doc. 71-2.

Defendants argue that Plaintiff's admission that she "touched" Tubb when putting her hand up conclusively establishes their "legitimate non-discriminatory reason" for terminating Plaintiff. Doc. 80 at 7. Defendants claim that "any employee who did what Ms. Ray did would have been terminated, no matter who the supervisor was" and that "it is undisputed that DSG's policy and practice is to terminate any employee who places hands on another employee during a confrontation." *Id*. However, the Court notes that Rogers himself disputed this purportedly non-discretionary policy and practice. During his deposition, Rogers was asked if Plaintiff was fired on the night of the alleged confrontation, and he testified that "[s]he would not have been terminated, no. Our policies say *up to* termination for a physical confrontation." Doc. 59-3 at 23-

24 (emphasis supplied). Aside from the dispute over whether Plaintiff punched or shoved Tubb, there appears to be an issue as to what exactly DSG's policy and practice were.

The material events surrounding Plaintiff's termination are disputed, and at summary judgment, the Court does not make determinations of credibility. Because factual controversies are to be resolved in Plaintiff's favor at the summary judgment stage, the Court finds that Plaintiff has created an issue of fact as to whether her termination was caused by her rejection of Rogers' sexual advances. *See Little*, 37 F.3d at 1075.

### ii. Loss of Accounts and Commissions

In addition to her termination, Plaintiff contends she suffered another tangible employment action when accounts and commissions were taken from her and given to Tubb. Plaintiff's affidavit states that her salary was commission based and that Rogers, with whom Tubb told Plaintiff she had a sexual relationship, routinely gave more business to Tubb, and the affidavit details a specific instance in which "Dana was given a large account that all the employees knew was [Plaintiff's]" and as a result was awarded a sale totaling around $7,000. Doc. 71-2. Plaintiff further claims that she "was shorted approximately $3,000 dollars on my last commission check." *Id*. The explanation Defendants offer for why Plaintiff is not entitled to the $3,000 she was allegedly shorted on her last commission check relates to whether the non-discriminatory explanation proffered by Defendants was a pretext for her termination and will not be decided on summary judgment. Doc. 80 at 3-4.

The loss of accounts and commissions constitutes "a decision causing a significant change in benefits." *Bustillos v. Mississippi Valley State Univ.*, No. 4:12-CV-007-SA-JMV, 2013 WL 123730, at *3 (N.D. Miss. Jan. 9, 2013) (citing *Cotton v. Cracker Barrel Old Country Store, Inc.,* 434 F.3d 1227, 1231 (11th Cir. 2006) ("An employment decision that alters the employee's

compensation qualifies as a tangible employment action")). Viewing these facts in the light most favorable to Plaintiff, the Court concludes she has demonstrated the existence of a genuine issue of material fact as to whether the alleged loss of accounts and commissions resulted from her rejection of Rogers' sexual advances.

The Court finds that Plaintiff has presented sufficient evidence of causation to withstand summary judgment on her *quid pro quo* sexual harassment claim. It is a question for the jury whether there was a nexus between Rogers' alleged sexual harassment and the tangible employment actions Plaintiff experienced. Defendants' motion for summary judgment as to Plaintiff's *quid pro quo* claim is denied.

### b. Sexual Harassment by Hostile Work Environment under Title VII

If a jury finds that Plaintiff suffered a tangible employment action for her rejection of Rogers' sexual advances, *quid pro quo* sexual harassment is established, and Plaintiff is precluded from recovering under her claim for a hostile work environment. *Boone v. Mississippi Valley State Univ.*, No. 4:04-CV-158-P-B, 2005 WL 1421125, at *4 (N.D. Miss. June 9, 2005). However, if a jury does not find sufficient evidence of *quid pro quo* sexual harassment, then it must determine whether there was unwelcome harassment sufficiently severe or pervasive to create a hostile work environment. *Boone,* 2005 WL 1421125, at *4. In that event, the question becomes, "if proved, would the actions ascribed to the supervisor by the employee constitute severe or pervasive sexual harassment?" *Casiano*, 213 F.3d at 284.

To determine whether an environment is "hostile" or "abusive" under Title VII, "courts look at the totality of the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harvill v.*

*Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005). "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Id*. If the actions constitute severe or pervasive sexual harassment, then "the employer is vicariously liable – unless the employer can prove both prongs of the *Ellerth/Faragher* affirmative defense." *Casiano*, 213 F.3d at 284.

### i. Severe or Pervasive Harassment

Defendants argue that Rogers' conduct was not sufficiently severe or pervasive under the reasonable person standard to alter the conditions of her employment and create an abusive working environment. In support of their argument, Defendants point to the fact that Rogers denies making sexual advances toward Plaintiff or touching her inappropriately, that Plaintiff's sales did not suffer, that she did not report the alleged harassment until after she had been terminated for cause or seek employment elsewhere, that DSG's human resource department concluded there was no evidence substantiating Plaintiff's claims of harassment, and that none of Plaintiff's coworkers (at least the ones interviewed by DSG) noticed the alleged harassment.

On the other hand, Plaintiff's affidavit states:

Many times, Jeff Rogers would touch my breasts in a demeaning or playful manner. The name tags were magnetic. Jeff Rogers would dislodge my name tag from the magnet by dragging his hand down the front of my breasts or by hitting the name tag and my breasts. Usually, the name tag would fall on the floor; but the magnet would fall down my blouse. He would then ask me to let him get the magnet out of my blouse. I was offended and always refused.

Mr. Rogers would come up behind me while I was seated and working at a computer. He would press his penis and scrotum on my back and sometimes whisper to me the things he could do to me and that he could go twice – that he was a big boy and that I couldn't handle it – you like it like that. Other times he would simply come close to me from behind when I had no fast way to evade him and whisper to me the sexual things he planned to do to me. When I had paperwork to do at the computer, Jeff would come up in front of me as I was seated, put his crotch

near my face and tell me that I saw it and knew what I could do with it (his private parts).

Jeff Rogers sometimes pulled my hair by gripping and holding. Jeff would then ask me if it made the hair on my legs grow like it does to Dana's.

He would pull my shirttail out and clean his glasses. Jeff frequently sent inappropriate texts. Much of his communication with me was about sex. He would insist on putting chocolate candy in my mouth in a sexual way that made me very uncomfortable.

*        *        *

He almost always did these things when others were not around to witness. I always let him know that that sort of behavior was unwelcome and asked him to stop. Nonetheless, Mr. Rogers was constantly assailing me with his sexual touching, lewd statements and games. I wanted none of this!

*        *        *

I cried almost every day at work because of the way Jeff Rogers treated me and humiliated me. Jeff knew I was crying. Jeff would call me into his office and tell me to quit crying, suck it up and have tougher skin.

Doc. 71-2 (paragraph numbers omitted).

While it may be true that none of the employees interviewed by DSG as part of its investigation witnessed any sexual harassment, Plaintiff explained that Rogers almost always engaged in the conduct when there were no witnesses, and the Fifth Circuit has recognized that victims of sexual harassment "are often the only ones, besides the perpetrators, who are aware of sexual harassment." *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 463 n.19 (5th Cir. 2013) (quoting *Adams v. O'Reilly Auto., Inc.,* 538 F.3d 926, 933 (8th Cir. 2008)). In any event, Plaintiff's testimony is corroborated at least in part by that of her former coworker Charles Nichols, whose affidavit states:

We wore magnetic name tags. On multiple occasions, I saw Jeff Rogers swat at Tina Ray's name tag, hit her breasts and knock her name tag off her shirt. The name tag would fall down on the inside of her shirt and Jeff would ask Tina "want me to get that out for you?"

We sometimes worked at computers and had to sit to do our computer work. Sometimes, when Tina Ray had a question, or he was nearby, Jeff Rogers would come and stand to the side of her awkwardly close violating her personal space pressing his crotch area to her profile.

Jeff Rogers would come up behind Tina Ray and pull her shirt out at the waist and clean his glasses with her shirt.

I thought Jeff Rogers had gone beyond the line and personally told him that he needed to stop that sort of behavior as it would get him in trouble. Jeff said he wasn't worried about it and continued to do the same things to Ms. Ray.

Doc. 71-3 (paragraph numbers omitted).

Defendants argue there is no basis to conclude that the alleged harassment was pervasive enough that higher management at DSG should have known about it. Defendants confuse the applicable legal standard.[1] Rogers being Plaintiff's supervisor, the issue is not whether the sexual harassment was severe or pervasive enough to alert higher management but whether it was severe or pervasive enough "to alter the conditions of the victim's employment and create an abusive working environment." *Aryain*, 534 F.3d at 479.

In *Farpella-Cosby v. Horizon Health Care*, the Fifth Circuit upheld a verdict finding a hostile work environment where the plaintiff's supervisor made frequent comments that her large number of children was due to a proclivity to engage in sexual activity and that he "knew what she liked to do." 97 F.3d 803, 805 (5th Cir. 1996). The supervisor once joked that the plaintiff "doesn't know how to use condoms." *Farpella-Cosby,* 97 F.3d at 805. The supervisor frequently inquired about the plaintiff's sexual activity, whether she had taken any men home the night

---

[1] *See Watts v. Kroger Co.*, 170 F.3d 505, 509 n.3 (5th Cir. 1999) ("In cases where the harasser is a co-worker, as opposed to a supervisor, the full test outlined in *Jones v. Flagship International*, 793 F.2d 714, 719–720 (5th Cir.1986) is applicable. The fifth factor outlined in *Jones* states "[r]espondeat superior, i.e., that the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Watts*, 170 F.3d at 509.

before (while off duty), and whether she "got any." *Id.* The supervisor once made crude sexual remarks about the smell coming from the plaintiff's office. *Id.*

As later discussed in *Alaniz v. Zamora-Quezada*, the *Farpella-Cosby* Court "focused on the frequency and crudeness of the remarks, as well as the frequent inquiries about the plaintiff's sexual activity, and determined that this conduct was sufficiently severe and pervasive to create a hostile work environment, even without evidence of propositioning or inappropriate touching." 591 F.3d 761, 771–72 (5th Cir. 2009).

The Fifth Circuit found the facts in *Alaniz* were also sufficient to support a hostile work environment claim. 591 F.3d at 772. The male owner of a medical clinic repeatedly asked a female employee out, propositioned her, commented on her physical appearance and dress, and repeatedly made bodily contact. *Id.* As to a different female employee, the owner initiated unwanted and inappropriate contact and directly propositioned her. *Id.*

In the present case, if the accounts of Plaintiff and Nichols are to be believed, it requires little effort to imagine a jury concluding that Plaintiff suffered sexual harassment at the hands of her supervisor that was so severe and pervasive as to create a hostile work environment.

### ii. Ellerth/Faragher Defense

Because there is a genuine issue of material fact with respect to Plaintiff's hostile work environment claim, the Court must consider DSG's *Ellerth/Faragher* affirmative defense. Under *Ellerth/Faragher*, even if a plaintiff can otherwise establish a hostile work environment claim because the underlying alleged misconduct was sufficiently severe or pervasive, an employer is entitled to immunity when it establishes (1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by

the employer or to avoid harm otherwise. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807

(1998). "The *Ellerth/Faragher* affirmative defense is conjunctive," and the defendant bears the

burden of proving both elements by a preponderance of the evidence. *Aryain*, 534 F.3d at 483.

An employer can avoid liability for severe or pervasive harassment by its supervisors

only if it can show *both* that it acted reasonably in preventing and correcting harassment *and* that

the employee acted unreasonably in failing to take advantage of anti-harassment procedures that

were available. *Boh Bros.*, 731 F.3d at 462. The key issue as to each prong of the defense is

reasonableness – the reasonableness of the employer's anti-harassment efforts and the

reasonableness of the employee's failure to take advantage of the available remedies. For the

reasons discussed below, the Court concludes that these issues should be decided by a jury in this

case and not by the Court.

An employer can satisfy the first prong of the *Ellerth/Faragher* defense by implementing

suitable institutional policies and educational programs regarding sexual harassment. *Id*. at 462-

63. As the Supreme Court noted in *Ellerth*, "[w]hile proof that an employer had promulgated an

antiharassment policy with complaint procedure is not necessary in every instance as a matter of

law, the need for a stated policy suitable to the employment circumstances may appropriately be

addressed in any case when litigating the first element of the defense." *Ellerth*, 524 U.S. at 765.

Thus, the court often looks to an employer's policies and programs in determining whether it

took reasonable measures to prevent discriminatory behavior. *Boh Bros.*, 731 F.3d at 463.

Defendants claim DSG exercised reasonable care to prevent and correct sexual

harassment because it had a sexual harassment policy in place, because Plaintiff was aware of the

policy, and because she signed documents stating that she understood the policy and agreed to

abide by it. Doc. 58 at 11; *see also* Doc. 59-1 at 75; 59-1 at 76. DSG's "Discrimination and Harassment Policy Statement" states:

> This Company will not tolerate any form of unlawful discrimination or harassment, including sexual harassment. Any employee who engages in unlawful discrimination, harassment or sexual harassment will be subject to appropriate discipline, up to and including termination. Prohibited sexual harassment is defined as follows:  Unwelcomed sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature constitutes sexual harassment when (1) submission to such conduct is made whether explicitly or implicitly a term or condition of an individual's employment; (2) submission to or action of such conduct by an individual is used as the basis for employment decisions affecting such individuals; or (3) Such conduct has the purpose of effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment.

Doc. 59 at ¶32; 59-1 at 75. DSG's Employee Handbook also contains this policy statement as a part of its "Equal Employment Opportunity Statement and No Harassment Policy" along with the following directive:

> If you believe you have been unlawfully discriminated against, it is your responsibility to immediately report the matter to your supervisor, another male or female member of management with whom you are comfortable in making the complaint, or directly to the Regional Manager, Director of Human Resources or President. Your privacy will always be respected to the extent reasonably possible according to the circumstances, and confidentially maintained to the extent consistent with the effective investigation of your complaint.

Doc. 59-1 at 77-78.

"Where the plaintiff admits that he or she was on notice of a policy and complaint procedure and the court determines that the policy was reasonable, we have consistently found the first prong [of the *Ellerth/Faragher* defense] satisfied."  *Pullen v. Caddo Par. Sch. Bd.*, 830 F.3d 205, 210 (5th Cir. 2016).  Defendants argue that because Plaintiff was on notice of DSG's policy and complaint procedure, the first prong is satisfied. However, this assumes a conclusion

that DSG's policy and procedure were reasonable. The Court believes there are fact issues prohibiting such a conclusion on summary judgment in this case.

According to Plaintiff's affidavit, she never received training on the prevention or reporting of sexual harassment while at DSG and could recall no such educational program; she could recall no signs posted in the workplace informing employees how to prevent or report sexual harassment. Doc. 71-2. Defendants argue this evidence is irrelevant given Plaintiff's admitted awareness of the policy and complaint procedure. Defendants are mistaken. "Both the harasser's knowledge of the policy and the victim's awareness of it (and associated complaint procedures) are relevant to whether the company acted reasonably." *Pullen,* 830 F.3d at 210; *see also Faragher*, 524 U.S. at 781-82 (noting employer's failure to disseminate its policy such that employees, including harassing supervisors, were aware of it); *Boh Bros.*, 731 F.3d at 464-65 (discussing as "policy failures" harasser's and other employees' lack of awareness of policy and employer's insufficient implementation and training efforts); *Wyatt v. Hunt Plywood Co., Inc.,* 297 F.3d 405, 410 (5th Cir. 2002) (noting employer held regular meetings with supervisory staff to train them on preventing sexual harassment).

DSG, who carries the burden to prove its affirmative defense, has presented no evidence that Jeff Rogers or any other employee (other than Plaintiff) was provided with or was aware of its sexual harassment policy, let alone that employees had any education and training on it. Even if other employees were provided with a copy of the policy, it contains no guidance on what an employee who witnesses the sexual harassment of another employee should do or how he/she should report it. *See Casiano v. AT&T Corp.,* 213 F.3d 278, 286 (5th Cir. 2000) (noting employer's policy "encourages both those who believe they are being harassed and those who witness harassment" to notify designated employer representatives). The affidavit of Plaintiff's

former coworker Charles Nichols states employees never had any training on how to prevent, react to, or report sexual harassment; and he could recall seeing no signs posted anywhere explaining how employees were to report incidents of sexual harassment. Doc. 71-3. This evidence could have some significance to a jury in this case as, according to Nichols, he believed Rogers was acting inappropriately towards Plaintiff and attempted to intervene by addressing Rogers directly, to no effect. *Id.*

Plaintiff also complains that DSG's policy provides no assurances of safety to the reporting victim by promising confidentiality or anonymity or by assuring protection against reprisal by the harasser. It is true that DSG's written policy (at least the one provided to Plaintiff) contains no information regarding when, how, or by whom a report of sexual harassment would be investigated. These omissions could bear on the reasonableness of DSG's policy. *See Giddens v. Community Educ. Centers Inc.,* 540 Fed.Appx. 381, 389 (5th Cir. 2013) (noting policy that was provided to employees specified that Director of Employee Relations was required to conduct prompt, confidential investigation).

There are also issues regarding DSG's procedures for responding to alleged sexual harassment and its actual response to such allegations. An employer's "procedures for responding to alleged sexual harassment" and whether it took "prompt remedial action" are both relevant in sexual harassment cases. *EEOC v. Dolgencorp, LLC,* No. 3:17-CV-23-MPM-RP, 2018 WL 2124098, *6 (N.D. Miss. May 8, 2018) (citing *Nash v. Electrospace Sys., Inc.,* 9 F.3d 401, 402 (5th Cir. 1993)). An employer's investigation of reports of sexual harassment bears upon the "prompt correction" aspect of *Ellerth/Faragher's* first prong and ultimately becomes a "prevention" measure as well. *Boh Bros.*, 731 F.3d at 465 n. 25. An employer's response to

complaints of harassment are analyzed under the first prong of the *Ellerth/Faragher* defense. *Williams v. Admin. Rev. Bd.*, 376 F.3d 471, 479 (5th Cir. 2004).

"'Prompt remedial action' must be 'reasonably calculated' to end the harassment." *Skidmore v. Precision Printing and Packaging, Inc.,* 188 F.3d 606, 615 (5th Cir. 1999) (quoting *Jones v. Flagship International,* 793 F.2d 714, 719-20 (5th Cir. 1986)). What constitutes prompt remedial action depends on the facts of the case, as "not every response by an employer will be sufficient to discharge its legal duty." *Skidmore,* 188 F.3d at 615 (quoting *Waltman v. International Paper Co.,* 875 F.2d 468, 479 (5th Cir. 1989)). This Court has stated:

> In the court's view, the proof of the pudding is in the eating, and it matters very little what policies an employer chooses to enact if it does not actually act reasonably in response to complaints by employees. Once again, the *Faragher-Ellerth* inquiry involves a determination whether the employer acted reasonably to "prevent and correct promptly any sexually harassing behavior," and while policies and procedures are quite relevant in this regard, any corrective action taken (or not taken) are very much relevant as well.

*Dolgencorp,* 2018 WL 2124098 at *8.

The only evidence before the Court regarding DSG's actual response to a report of sexual harassment is the evidence regarding its response to Plaintiff's report. While Plaintiff's post-termination report may not be relied upon to defeat the second prong of the *Ellerth/Faragher* defense, DSG's response to the report is relevant to whether the first prong of the defense has been satisfied. *See Lauderdale v. Texas Dept. of Criminal Justice, Institutional Div.,* 512 F.3d 157, 165 (5th Cir. 2007) (holding that plaintiff's post-resignation report was insufficient to defeat second prong of *Ellerth/Faragher* defense but that employer's subsequent investigation confirmed satisfaction of first prong).

Plaintiff reported the alleged sexual harassment to DSG's Human Resources Manager on July 1, 2016; yet, DSG did not investigate her complaint for almost three months until September

29, 2016 when it began interviewing employees. DSG argues that its investigation into the alleged harassment was delayed by Plaintiff's failure to provide a written statement or supporting documents. Only after receiving a letter from Plaintiff's attorney on September 12, 2016, including Plaintiff's narrative statement detailing the alleged harassment, did DSG's Human Resources Department begin conducting its investigation. According to DSG, it followed its "established procedure" (which apparently does not appear in its employee handbook) by waiting until it received a written complaint and any supporting evidence from Plaintiff before conducting its investigation. The Court believes a jury could reasonably conclude that DSG's procedure and response were lacking.

The statement Plaintiff gave DSG on July 1, 2016, contained concrete and specific details, including the identity of the alleged harasser and specific details about the nature and extent of the harassment. Doc. 60-7. Although Plaintiff was no longer employed at DSG, the alleged harassing supervisor remained, and Plaintiff specifically reported that Rogers was acting inappropriately towards another employee as well, and that she believed Rogers was actually having sex with that employee. *Id.* Was DSG's delay of almost three months before interviewing that employee or otherwise investigating Plaintiff's allegations reasonably prompt? The Court believes this is a jury question. *See Aryain*, 534 F.3d at 482 (holding genuine issue of material fact existed as to whether employer promptly investigated and addressed sexual harassment claims when it waited at least two months to respond).

The Court will decline to hold, as a matter of law, that DSG has satisfied the first prong of the *Ellerth/Faragher* defense. An in-depth discussion of the second prong is therefore unnecessary, but some discussion is provided below so as to facilitate any appellate review.

There is no dispute that Plaintiff did not report the harassment until after her termination.[2] However, she believed that reporting the harassment would be futile, and she feared retaliation and was desperate to keep her job. Doc. 71-2. Of course, "an employee's subjective, ungrounded fears of unpleasantness or retaliation" do not excuse a failure to report harassment. *Boh Bros.,* 731 F.3d 444, 463 n.19 (quoting *Colo. Dep't of Tranp.*, 563 F.3d 1052, 1063 (10th Cir. 2009) (quoting *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001))). As to futility, "once it becomes objectively obvious that the employer has no real intention of stopping the harassment, the harassed employee is not obliged to go through the wasted motion of reporting harassment." *Woods v. Delta Beverage Group, Inc.,* 274 F.3d 295, 301 (5th Cir. 2001). The question, then, is whether Plaintiff's fears of retaliation and futility were subjective and ungrounded or objectively reasonable.

As discussed above, DSG's written policy itself provided no information regarding when, how, or by whom an investigation would be conducted, it provided no assurances of protection against reprisal by a harassing supervisor, and there was no training or education on the policy or how to report misconduct. The Fifth Circuit has emphasized that a plaintiff's success will more often turn on whether he/she promptly reported the harassing conduct "as employers' anti-harassment policies become increasingly comprehensive and well-implemented." *Boh Bros.*, 731 F.3d at 463 n.19. It would follow, therefore, that deficiencies in the comprehensiveness and implementation of an employer's policy may bear upon the reasonableness of a plaintiff's failure to report.

---

[2]The Court agrees with Defendants that Plaintiff's affidavit testimony – offered for the first time in opposition to summary judgment and flatly contradicting her previous testimony – that she discussed the sexual harassment with a member of DSG management several times before she was discharged cannot create a fact issue so as to survive summary judgment. *In re Deepwater Horizon,* 857 F.3d 246, 250 (5th Cir. 2017). Plaintiff may certainly attempt to convince the jury that she had such discussions, but the Court will not consider that testimony at this stage.

Aside from her fear of retaliation, Plaintiff believed any report would be futile because her previous complaints to management about other misconduct – backstabbing and ticket stealing – were ignored. Doc. 71-2. Although Plaintiff's specificity regarding her previous reports is lacking (she could not identify the person to whom she made the reports), and this vagueness may bear upon her credibility, Plaintiff's credibility is to be determined by the jury, not by the Court, which at this stage must view the facts in the light most favorable to Plaintiff. Additionally, Plaintiff's former coworker Charles Nichols, who witnessed Rogers act inappropriately towards Plaintiff and who unsuccessfully attempted to intervene, also did not believe anything would have been done if Plaintiff had reported the harassment to management. Doc. 71-3. This evidence may lend some objectivity to Plaintiff's fears. The Court believes a jury should decide whether Plaintiff unreasonably failed to report the harassment to DSG.

### III.  Intentional Infliction of Emotional Distress

Plaintiff has brought a state law claim for intentional infliction of emotional distress against "the Defendant." She claims that "Defendant engaged in extreme and outrageous conduct which was intended to and which would reasonably cause emotional distress to [her]." *Id.*

The standard for intentional infliction of emotional distress in Mississippi is very high: the defendant's conduct must be "wanton and willful and [such that] it would evoke outrage or revulsion." *Hatley v. Hilton Hotels Corp.*, 308 F.3d 473, 476 (5th Cir. 2002). The Mississippi Supreme Court has defined conduct constituting intentional infliction of emotional distress as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Speed v. Scott,* 787 So.2d 626, 630 (Miss.2001). "[L]iability does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." *Jones v. Jackson State*

*Univ.*, No. 3:07-CV-72-DPJ-JCS, 2008 WL 682411, at *5 (S.D. Miss. Mar. 7, 2008) (*quoting Raiola v. Chevron U.S.A., Inc.,* 872 So.2d 79, 85 (Miss. Ct. App. 2004)). The conduct itself must be extreme and outrageous:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.

*Dandridge v. Chromcraft Corp.,* 914 F.Supp. 1396, 1405 (N.D. Miss. 1996) (quoting *Burroughs v. FFP Operating Partners, L.P.,* 28 F.3d 543, 546 (5th Cir. 1994)). As the Fifth Circuit has noted, "even though conduct may violate Title VII as sexual harassment, it does not necessarily become intentional infliction of emotional distress." *Hatley v. Hilton Hotels Corp.*, 308 F.3d 473, 476 (*quoting Prunty v. Arkansas Freightways, Inc.,* 16 F.3d 649, 654 (5th Cir.1994)).

In addition, "[a] claim for intentional infliction of emotional distress will not ordinarily lie for mere employment disputes." *Lee v. Golden Triangle Planning & Dev. Dist., Inc.,* 797 So.2d 845, 851 (Miss. 2001). "Only in the most unusual cases does the conduct move out of the realm of an ordinary employment dispute into the classification of extreme and outrageous, as required for the tort of intentional infliction of emotional distress." *Grice v. FedEx Ground Package Sys., Inc.*, 925 So.2d 907, 912 (Miss. Ct. App. 2006) (quoting *Prunty*, 16 F.3d at 654). Rather, workplace-related claims for intentional infliction of emotional distress are generally "limited to cases involving a pattern of deliberate, repeated harassment over a period of time." *Lee,* 797 So.2d at 851.

In *McKenzie v. Collins*, the trial court found that where the plaintiff alleged a pattern of willful and pervasive sexual harassment by her supervisor for more than a year and a half, the matter presented the "uncommon case where a claim for intentional infliction of emotional distress in the employment context may be actionable." No. 5:07-CV-68-DCB-JMR, 2008 WL

2705530, at *10 (S.D. Miss. July 9, 2008). There, the plaintiff's specific allegations of harassing behavior, including inappropriate touching and comments of a sexual nature, "could potentially satisfy the high threshold of extreme and outrageous conduct established by Mississippi law," and judgment as a matter of law was denied. *McKenzie,* 2008 WL 2705530, at *10.

Considering Defendants arguments that even if Rogers' remarks and actions could be considered "flirtatious, uncalled for, or ill-advised" they were not so outrageous as to be "utterly intolerable in a civilized community," the Court finds nonetheless that the alleged remarks combined with the allegations of inappropriate touching create an issue of fact as to whether Rogers' conduct satisfies the high threshold of extreme and outrageous conduct established by Mississippi law.

## IV.    Assault and Battery

Defendants argue they are entitled to judgment as a matter of law on Plaintiff's claims for assault and battery "because there is no evidence that Mr. Rogers acted with intent to cause a harmful or offensive contact or an imminent apprehension of such contact." Docket 58 at 14. DSG claims that "[i]t is unclear what actions by Mr. Rogers form the basis of Ms. Ray's assault and battery claim." *Id*. at 16. In their reply brief, Defendants note that Plaintiff did not respond to their summary judgment arguments on her assault and battery claims. Docket 80 at 14. Having closely reviewed Plaintiff's response to Defendants' motion, the Court agrees that Plaintiff does not defend her state law claims for assault and battery. Plaintiff's response defends her claims for sexual harassment under Title VII which includes a detailed discussion of Rogers' unwelcomed touching; however, Plaintiff does not defend these allegations in the context of an assault and battery under Mississippi law.

When a party fails to pursue a claim or defense beyond the party's initial pleading, the claim is deemed abandoned or waived. *Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned claim when she failed to defend claim in response to motion to dismiss); *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (noting that "an issue raised in the complaint but ignored at summary judgment may be deemed waived") (citation omitted); *Vela v. City of Houston*, 276 F.3d 659, 678 (5th Cir. 2001) ("a party in his opposition to a motion for summary judgment cannot abandon an issue and then ... by drawing on the pleadings resurrect the abandoned issue") (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983)).

Because Plaintiff failed to pursue her claims against Defendants for assault and battery, they are no longer before the Court, as she has abandoned or waived them. Accordingly, based on her abandonment or waiver of her state law claims for assault and battery, the Court will grant summary judgment in Defendants' favor on these claims.

### Conclusion

For the reasons discussed herein, Defendants' Second Motion for Summary Judgement is GRANTED in part and DENIED in part. Summary judgment is granted as to Plaintiff's assault and battery claims, and those claims are dismissed with prejudice. Summary judgment is denied as to all other claims.

**SO ORDERED**, this the 3rd day of January, 2019.

/s/ Roy Percy
UNITED STATES MAGISTRATE JUDGE